# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

FIRST NATIONAL BANCORP INC., *et al.*,

       Plaintiffs,

vs.                                    Civ. No. 14-00387 MCA/WPL

KRISTINA ALLEY, *et al.*,

       Defendants.

## <u>ORDER</u>

This case is before the Court upon Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction Hearing [Doc. 2]. The Court has considered the written submissions of the parties, the evidence admitted by the Court, the arguments and representations of the parties addressed to the Court during the evidentiary hearing, and the relevant law, and is otherwise fully advised in the premises.

**Background**

Plaintiffs are affiliated business entities. Plaintiffs First National Bank of Santa Fe ("FNBSF") and First Santa Fe Advisors, LLC ("FSFA"), are wholly-owned subsidiaries of Plaintiff First National Bancorp Inc. ("FNB"), f/k/a New Mexico Banquest. FNB is the managing and sole member of FSFA. FSFA was created for "regulatory rationalization, role clarification, conflict reduction, and financial transparency."

Defendants Alley, Kantor and Marion are former employees of FNBSF and FSFA. Each Defendant was employed by FNBSF as an at-will employee pursuant to a written

1

employment contract.  In July 2012, Defendants became full time employees of FSFA, each serving as a managing director.  There is no evidence that Defendants performed work for FNBSF subsequent to their employment with FSFA.

Each individual Defendant brought to her or his employment with FNBSF, and then FSFA, considerable specialized experience and technical skill in the business of advising investors and managing investments.

In October 2013, while employed by FSFA, Defendants, assisted by Michael Hampton, Defendant Kantor's fiancé, organized Defendant Santa Fe Advisors ("SFA") as a New Mexico limited liability company and registered the internet domain name, "santafeadvisorsllc.com."   Defendants  submitted to the United States Securities and Exchange Commission a "form ADV," the substance of which was largely plagiarized from a public filing submitted to the SEC by FSFA. Defendants engaged in these activities on their own time.

On January 28, 2014, Defendant Marion downloaded from FSFA's server around fifty confidential documents, which he e-mailed to his personal account.  Marion did not acquire these documents with the intention of using the information contained in them in the course of SFA's business.  Neither Marion, Alley, nor Kantor subsequently accessed these documents or used information obtained from these documents in the course of SFA's business.  The information contained in these documents is of no practical value to Defendants in competing with FSFA.[1]

---

[1] Defendants' testimony supports the findings in this paragraph.  The Court finds Defendants' testimony on these points to be credible and persuasive.  The Court finds that Plaintiffs' witness, Ms. Fulton-Anderson, exaggerated the

On the afternoon of Friday, April 18, 2014, each Defendant resigned from her or his employment with FSFA.  Defendants immediately began soliciting former clients of FSFA as clients of SFA.  Defendants have been quite successful, acquiring  some 51 former clients of FSFA as clients of SFA.[2]

**Standards for Obtaining a Preliminary Injunction**

"To obtain a preliminary injunction the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013).   The Court will separately apply these factors to each of the claims upon which Plaintiffs seek provisional injunctive relief.

**Lanham Act**

Plaintiffs seek an injunction  to restrain Defendants from  infringing upon the service mark[3] "First Santa Fe Advisors," allegedly in violation of 15 U.S.C. § 1125(a). Plaintiffs have not registered the FSFA mark with the Patent and Trademark Office,  but nevertheless claim to have a protected  interest in the  mark through the use of the mark in their business beginning in 2011.  Because the FSFA mark is not registered, Plaintiffs are

---

value to Defendants of the information contained in the documents acquired by Defendant Marion.  The Court was not persuaded by Ms. Fulton-Anderson's testimony on this point.

[2] In their Amended Complaint [Doc. 26], Plaintiffs allege that as of May 23, 2014, 51 former clients, amounting  to 80% of FSFA's clients, have moved their business to SFA.

[3] "A service mark is a word, name, symbol, device, or any combination thereof used 'to identify and distinguish the services of one person, including a unique service, from the services of others, and to indicate the source of the services.'" *First Savings Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 651 n.7  (10th Cir. 1996) (quoting 15 U.S.C. § 1127).

required to show that the mark is protectable.  *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004) ("Because [plaintiff] has never registered the term with the United States Patent and Trademark Office, it is his burden to demonstrate that it is protectable under § 43(a).").

The FSFA mark comprises the prefix "First"; a geographically descriptive  term,[4] "Santa Fe";  and a generic or descriptive term, "Advisors." "First" implies a business entity that is "first in time or quality," and when applied to a business that is not actually first in time may amount to mere trade puffery.  *First Savings Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 655 (10th Cir. 1996).  The best case that Plaintiffs have made out is that the FSFA service mark is weakly descriptive.  Because the FSFA mark is neither suggestive, arbitrary, nor fanciful, it must have acquired "secondary meaning" to be entitled to trademark protection.  *Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045,  1051 (10th Cir. 2008) .

> Secondary meaning refers to the level of distinctiveness that a descriptive mark must attain in the minds of consumers before it is eligible for trademark protection.  "To acquire secondary meaning, a descriptive mark must have been used so long and so exclusively by one producer with reference to his goods or articles that, in the trade and to that branch of the purchasing public, the mark has come to mean that the article is his product."

*Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1154 (10th Cir. 2013) (citation omitted).  Our Court of Appeals has identified  the following factors that it views as helpful in evaluating the existence of secondary meaning:  "(1) length and manner of the

---

[4] If used outside Northern New Mexico—say an investment firm located in New York City—the term "Santa Fe" might be used for its cachet. Here, the  term "Santa Fe" is being applied to a business located in the City of Santa Fe, in Santa Fe County,  New Mexico.

mark's use, (2) nature and  extent of advertising and promotion of the mark, and (3) efforts to promote a conscious connection in the public's mind between the  mark and a product [or service]."  *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1008 (10th Cir. 2014).  "The existence of secondary meaning is a question of fact with the burden of proof on the party claiming exclusive rights in the designation."  *Bristol-Myers Squibb Co. v. McNeil-PPC, Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992) (quotation  marks omitted). The evidence adduced by Plaintiff that "First Santa Fe Advisors" has acquired a secondary meaning is scant at best.  Plaintiffs' showing comes nowhere near establishing that the FSFA service mark has acquired a secondary meaning.   Without a showing that the FSFA mark is protectable, Plaintiffs cannot make out a claim for infringement. Plaintiffs have failed to establish a likelihood of success on the merits of their trademark infringement claim.

Turning to the second factor, the Court finds that Plaintiffs have not established irreparable harm arising from trademark infringement.  Plaintiffs argue that the Court should presume irreparable harm from the fact of trademark infringement.[5]  The full rule is that "trademark infringement 'by its very nature' results in irreparable harm to the owner of the mark, *unless the trademark is already weak*."  *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 663 (10th Cir. 1987) (citations omitted; emphasis added). Plaintiffs conceded during the evidentiary hearing that the conceptual strength of the

---

[5] There is a question as to the continued validity of the rule that irreparable harm is presumed where a trademark is wrongfully appropriated. *See Lorillard Tobacco Co. v. Engida*, 213 Fed. Appx. 654 (10th Cir. 2007) (unpublished decision) (questioning whether rule that irreparable harm is presumed where a trademark is wrongfully appropriated survives *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) (disapproving of categorical rules in connection with injunctions in intellectual property actions)).

FSFA mark is weak, bringing the FSFA mark within the exception to the presumption of irreparable harm.  Further, the letters from former clients advising FSFA that they are shifting their business to SFA strongly suggest to the Court that FSFA's clients are moving their business to SFA because they prefer to do business with the individual Defendants, not because these clients are confusing  Santa Fe Advisors with First Santa Fe Advisors.

As to the third factor, the Court finds that an injunction restraining  Defendants from using the service mark "Santa Fe Advisors" will not assist FSFA in retaining or attracting customers who prefer to do business with the individual Defendants, while at the same time it will seriously inconvenience Defendants.[6]  Just as the Court must consider the potential for irreparable harm to FSFA from the denial of an injunction, the Court must consider the potential for irreparable harm to Defendants' fledgling enterprise from the granting of a preliminary injunction.  1 Dan B. Dobbs, *Law of Remedies* § 2.11(2), text at n. 6 (2d ed. 1993).  Since Plaintiffs  have not at this point demonstrated a likelihood of success on the merits, there is a considerable risk that a preliminary injunction would seriously and *unjustly* burden Defendants.

As to the final factor, the Court finds that given Plaintiffs' failure to establish a likelihood that the First Santa Fe Advisors mark is protectable, the public interest in competition weighs against an injunction restraining Defendants from continuing to use the Santa Fe Advisors mark.

---

[6] Where the plaintiff's showing of infringement is weak, a court may consider financial hardship to the alleged infringer in balancing equities.  *See General Motors Corp. v. Urban Gorilla, LLC*,  500 F.3d 1222, 1229 (10th Cir. 2007).

**Breach of Contract**

      Plaintiffs also seek injunctive relief based upon  Defendants' alleged breach of confidentiality agreements, and, in the case of Defendant Kantor, an alleged breach of a non-competition agreement.

      **1. Confidentiality agreements.**

      The Court has carefully reviewed the form Confidentiality agreement, a copy of which each Defendant executed upon his or her initial employment with FNBSF. Defendant Alley's agreement defines the "Company" as "New Mexico Banquest Corporation and  its subsidiaries, the First National Bank of Santa Fe and the 6260 Corp (dba the Kelly Agency)," collectively.  Defendants Marion and Kantor's agreements define the "Company" as "New Mexico Banquest Corporation and its subsidiaries, the First National Bank of Santa Fe, First Santa Fe Insurance Services and First Santa Fe Wealth Management," collectively.  FSFA  is not mentioned anywhere in the Confidentiality agreements. The Confidentiality agreements cannot reasonably be construed as applying to confidential information belonging to FSFA. The confidential information downloaded by Defendants Marion and Alley was downloaded from FSFA's server.  Plaintiffs have not identified information belonging to New Mexico Banquest, FNBSF, 6260 Corporation, or First Santa Fe Wealth Management that Defendants have wrongfully obtained.  Plaintiffs have not established a reasonable likelihood of prevailing on their claim that Defendants breached the Confidentiality agreements.

      With respect to the second factor, the Court finds that Plaintiffs have not established that they suffer irreparable harm in the absence of an injunction because they

have not shown that Defendants are in possession of confidential information as defined in the Confidentiality agreements.

With respect to the third factor, the Court finds that the balance of harms is a wash. Plaintiffs will not be harmed by the denial of an injunction and Defendants will not be harmed by the grant of an injunction because Plaintiffs have not shown that Defendants were in possession of confidential information as defined in the Confidentiality agreements.

With respect to the final factor, the Court finds that Plaintiffs claim for breach of the Confidentiality agreements is a private contract dispute only remotely implicating the public interest.

### 2.     Kantor Non-Competition Agreement

### a.     Non-Competition Agreement

The Court finds that by its terms ¶ 2.a. expired in July 2013, one year after Kantor's employment with FNBSF ceased and he became a fulltime employee of the separate legal entity, FSFA.[7]  Plaintiffs have not established any likelihood of success on the merits of a claim based on ¶ 2.a.  Because Plaintiffs have absolutely no hope of prevailing on a ¶ 2.a. claim, the Court need not consider the remaining three preliminary injunction factors.

---

[7] The Court has considered, and rejects,  Plaintiffs' argument that ¶ 8 of the Non-Competition Agreement extends ¶ 2.a. to FSFA [Doc. 2 at 3 n.1]. As the Court reads ¶ 8, it enlarges the entities that may enforce FNBSF's rights under ¶ 2.a., but it does not enlarge the entities protected by ¶ 2.a. For example, pursuant to ¶ 8, an affiliate of FNBSF would have standing to assert FNBSF's rights under ¶ 2.a., but ¶ 8 does not convert every instance of "FNBSF" in ¶ 2.a. to "FNBSF and its respective affiliates, successors, and assigns."  *See U.S. Risk Ins. Group, Inc. v. Woods*, 399 S.W.3d 295, 301-02 (Tex. Ct.  App. 2013) (rejecting argument that provision stating that agreement is binding upon and inures to the benefit of the "'Company, its subsidiaries, affiliates, successors and assigns" enlarges definition of "Company" in covenant not to solicit "any Insureds for whom Employee has written contracts/policies on behalf of Company").

**b.      Confidentiality Agreement**

Paragraph 2.b. protects secrets, confidential information, customer lists, and other data "pertaining to FNBSF."  By its plain language, ¶ 2.b. does not apply to secrets, confidential information, customer lists, and other data pertaining to the separate legal entity, FSFA. Plaintiffs did not come forward with evidence that Kantor has used secrets, confidential information, customer lists, and other data pertaining to FNBSF in the course of SFA's business or that Kantor copied or removed such information.  Plaintiffs have not established any likelihood of success on the merits of their claim based  ¶ 2.b.

With respect to the second factor, the Court finds that  Plaintiffs have not established that they will irreparable harm in the absence of an injunction because they have not shown that Kantor is in possession of confidential information as defined in ¶ 2.b.

With respect to the third factor, the Court finds that the balance of harms is a wash.  Plaintiffs will not be harmed by the denial of an injunction and Defendants will not be harmed by the grant of an injunction because Plaintiffs have not shown that Kantor is in possession of confidential information as defined in ¶ 2.b.

With respect to the final factor, the Court finds that the public interest is only remotely implicated by this private contract dispute.

### c.     Non-Solicitation Agreement

### (i)     Customers

The non-solicitation-of-customers provision, ¶ 2.c.(i), states that "following the termination of [Kantor's] employment with FNBSF. . . for a period of twenty-four (24) full calendar months after the termination, [Kantor] shall not . . . solicit, contract, interfere with, re-write or divert any existing or prospective customer served or solicited by FNBSF during the period of [Kantor's] employment. . . ." Kantor's employment with FNBSF terminated in July 2012; therefore, ¶ 2.c.(i) will not expire until July 2014.

Read literally, ¶ 2.c.(i) prohibits Kantor from soliciting or contracting with customers of FNBSF with whom Kantor had no business relationship while employed by FNBSF.[8] For example, under a literal reading of ¶ 2.c.(i), Kantor cannot solicit a customer of FNBSF who had a FNBSF savings account during Kantor's employment, even if the customer did not have a FNBSF account under Kantor's management during his employment with FNBSF. So read, ¶ 2.c.(i) clearly is overbroad. *E.g.*, *Karp v. Avella of Deer Valley Inc.*, 2013 WL 5435212 *1 (D. Ariz. 2013) (applying Arizona law); *C & L Indus., Inc. v. Kiviranta*, 698 N.W.2d 240 (Neb. App. 2005) (applying Nebraska. law) ; *Peat Marwick Main & Co., v. Haass*, 818 S.W.2d 381 (Tex. 1991) (applying Texas law); *see generally* Mark A. Rothstein, *et al.*, *Employment Law* § 8.10 at 806 (4th ed. 2010) ("Provisions are usually considered overbroad if the former employee had not personally

---

[8] The letters from clients of FSFA who have decided to defect to SFA suggest that many of these FSFA former clients were also customers of FNBSF. Therefore, although ¶ 2.a. does not directly address the solicitation of clients of FSFA, an injunction enforcing ¶ 2.a. would coincidentally prohibit Kantor from soliciting or contracting with customers of FSFA who were also customers of FNBSF.

served those customers before and if the individual had never represented the firm's goodwill to those customers.").

"When a covenant not to compete is overbroad, the issue before the courts is whether it has any legal force or is a nullity.  Courts have generally taken one of three approaches:  nullification, striking offending portions, or rewriting the agreement." *Employment Law*, *supra*, § 8.5 at 790.  The Court has not found case law providing  clear guidance to the Court as to which of the three approaches the New Mexico Supreme Court would follow.  The firmly established rule under New Mexico law is that "courts will not rewrite a contract for the parties."  *Christmas v. Cimarron Realty Co.*, 98 N.M. 330, 332 (1982);  *Lovelace Respiratory Research Institute v. Funding Connection*, 2010 WL 4924960 *3 (N.M. Ct. App. 2010) (unpublished decision) ("Courts are without authority to change or rewrite the terms of parties' contracts.").  Therefore, rewriting the provision to cure the overbreadth and render ¶ 2.c. (i) enforceable is not an option under New Mexico law.  Blue penciling[9] ¶ 2.c. (i) is not an option because there is no language that can be stricken that cures the overbreadth and leaves an enforceable remainder.  The Court therefore finds that Plaintiffs have not established a likelihood of success on the merits of their claim that Defendant Kantor breached the non-solicitation-of-customers provision.

With respect to the second factor, the Court finds that in the absence of a preliminary injunction, Defendant Kantor will continue to successfully solicit FSFA's

---

[9] "Blue penciling" refers to the judicial technique of deleting objectionable language in a noncompetition agreement, leaving  an enforceable remainder. *Employment law*, *supra*, § 8.5 at 791.

11

clients, including clients who were customers of FNBSF while Kantor was employed by FNBSF. However, ¶ 2.c.(i) protects *FNBSF*, not FSFA. Irreparable harm to FSFA is not necessarily irreparable harm to FNBSF. The letters from defecting clients of FSFA state that they intend for the transfer of their investment business to SFA "to have no effect on any business relationship that we have with the First National Bank of Santa Fe…." Ex. 17. The Court finds that FNBSF, the party protected by ¶ 2.c.(i), will not suffer irreparable harm from the denial of a preliminary injunction.

As to the third factor, the Court has found that in the absence of an injunction, FNBSF will not suffer irreparable injury to its interests.  However, an injunction restraining Kantor from soliciting or providing investment services to customers of FNBSF would seriously disadvantage Kantor, given his and SFA's dependence on former clients of FSFA, many of  whom coincidentally  may have been customers of FNBSF during Kantor's employment by FNBSF.

As to the last factor, the Court finds that an injunction restraining Kantor from competing with FSFA for customers of FNBSF would adversely affect the public interest by depriving absent parties—those clients of FSFA who wish to move their accounts to FSA—of their choice of investment advisors.

### (ii)    Employees

Paragraph ¶ 2.c.(ii), the non-solicitation-of-employees provision, applies only if the former employee is solicited to work in a "business similar to the business of FNBSF being conducted at the time of  [Kantor's] termination."  The crucial question, therefore, is whether SFA is engaged in a business similar to the business being  conducted by

12

FNBSF in July 2012.  The Court's understanding is that for regulatory and other reasons certain investment management services were spun off from FNBSF and ultimately undertaken by a separate legal entity, FSFA.[10] The record does not permit the Court to determine when FNBSF ceased providing investment management services to its customers.  Plaintiffs, who have the burden of proof, have failed to establish that SFA is engaged in a business that is similar to one being conducted by FNBSF in July 2012.  The Court finds that Plaintiffs have not established a likelihood of success on the merits of their claim that Kantor breached the non-solicitation-of-employees provision by soliciting employees of FNBSF.

With respect to the second preliminary injunction factor, the Court finds that Plaintiffs have not shown that FNBSF will suffer irreparable harm in the absence of an injunction.  Plaintiffs have not demonstrated that Defendants intend to hire further FNBSF employees prior to the expiration of ¶ 2.c.(ii)  in July 2014.

With respect to the third factor, the Court has found that Plaintiffs have not shown irreparable harm from the denial of an injunction enforcing ¶ 2.c.(ii) because Defendants have not demonstrated a likelihood that Defendants intend to solicit or hire further FNBSF employees prior to the expiration of ¶ 2.c.(ii) in July 2014.[11] Similarly, because there has been no showing that Defendants intend to solicit  additional FNBSF employees prior to July 2014, Defendants would not be harmed by the grant of an injunction.

---

[10] According to Plaintiffs, the FSFA mark has been in use since 2011.

[11]The TRO proposed by Plaintiffs would enjoin Defendant from "intimidating and/ or soliciting Plaintiffs' employees." Plaintiffs have not specifically requested an injunction restraining Defendants from continuing to employ Hume and Piazola.  Such an injunction would seriously interfere with the rights of these third parties, who are neither parties to this lawsuit nor parties to Kantor's agreement with FNBSF. The Court is not inclined to award relief that effectively operates against Hume and Piazola in their absence.  See Fed. Civ. P. Rule 19(a)(1)(B)(i).

With respect to the final factor, the Court finds that public policy is only remotely implicated by Plaintiffs' request for an injunction enforcing ¶ 2.c(ii).

**Breach of Loyalty**

Plaintiffs complain that Defendants Alley, Kantor, and Marion breached fiduciary duties owed to FSFA by preparing to open SFA while they were employed by FSFA. Defendants credibly testified that their preparations for SFA were conducted on their own time, using their own resources, and that they did not begin actual solicitation of clients until after they resigned on April 18, 2014.  Under settled New Mexico law, Defendants had the right, while employed by FSFA, to make preparations for terminating their employment with FSFA and thereafter directly competing with FSFA. *Salter v. Jameson*, 105 N.M. 711, 714 (Ct. App. 1987).  Defendants did not breach their duty of loyalty to FSFA by organizing FSA, obtaining an internet domain name, creating a website, and registering with the SEC.  Further, the Court is not persuaded that FSFA's and Defendants' interests necessarily diverged because of Defendants' plan to open a competing investment service.  To the extent that Defendants planned to attract clients whom they had advised while employed by FSFA, it would have been in Defendants' interest to provide those clients with the best service of which they were capable, as Defendants' performance at FSFA would undoubtedly be taken into account by those clients if and when Defendants approached them on behalf of SFA. On the record now before the Court, Plaintiffs have not shown a likelihood of success on the merits of their breach of the duty of loyalty claim.

Turning to the second factor, the Court concludes that Plaintiffs will suffer irreparable harm in the absence of an injunction restraining SFA from competing with FSFA as FSFA's clients will continue to defect to SFA.

As to the third factor, the Court finds that in the absence of an injunction, FSFA's client base will continue to shrink.  But an injunction restraining Defendants from soliciting FSFA's customers would seriously disadvantage SFA, perhaps fatally, given its dependence on former clients of FSFA.  Opposing harms being of roughly equal gravity, the Court finds that the low probability of success demonstrated by Plaintiffs tips this factor in Defendants' favor.  *See American Hosp. Supply Corp. v. Hosp. Prod., Ltd.*, 780 F.2d 589, 593-94 (7th Cir. 1986) (observing that court entertaining a request for a preliminary injunction must choose course of action that will minimize the cost of being mistaken); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284-85 (4th Cir. 2002) (discussing *American Hospital Supply*).

As to the last factor, the Court finds that an injunction restraining SFA from competing with FSFA would be adverse to the public interest in free competition by denying FSFA's clients their choice of investment advisor.

**New Mexico Uniform Trade Secrets Act**

There is no dispute that on January 28, 2014, Defendant Marion e-mailed to his private e-mail account fifty or so confidential documents copied from FSFA's password-protected computer system.   Although Marion had access to these documents in the course of his work, he clearly violated protocol by e-mailing the documents to his private account. See Ex. 2, TriNet Employee Handbook at 17 ("Employees may not, without

15

authorization, transmit, retrieve or store company information of any kind on their personal email systems.").  Plaintiffs have made a showing  that at least some of the information in the documents transferred by Defendant constitutes trade secrets as defined  by NMSA 1978, § 57-3A-2(D), and that Defendant Marion's unauthorized acquisition  of  documents containing trade secrets  amounts to "misappropriation" by improper acquisition, § 57-3A-2(B)(1).

Misappropriation also can be accomplished by the improper disclosure or use of trade secrets.  Section 57-3A-2(B)(2).  Defendant Marion testified that he had not used the information in the improperly acquired documents and that SFA obtained the client information that it needed from the client or from FSFA at the client's request.  The Court finds this testimony credible.  Defendants do not need access to FSFA's records to obtain information about a client's financial situation and his or her investment goals: Defendants can reacquire this information merely by requesting it from the client.

The preceding observation that Defendants can obtain information about a client's financial situation and investment goals from the client assumes that Defendants' use of the identities of FSFA's clients in the course of SFA's business is not misappropriation of trade secrets.   New Mexico common law allows a former employee to use knowledge of the identities of clients of the former employer retained in the employee's memory to compete with the former employer.  *Excelsior Laundry Co. v. Diehl*, 32 N.M. 169 (1927); *Restatement (Second) Agency* §396 (1958).  The rule adopted in *Diehl* and  *Restatement*

16

§ 396 is inconsistent with treating Defendants' solicitation of FSFA's clients as misappropriation.[12] Although *Diehl* is an old case, it has not been overruled, and nearly ninety years on, *Diehl*'s balancing of the interests of employer, employee, and clients cannot be dismissed out of hand as unreasonable.

Because *Diehl* was decided prior to the adoption of the NMUTSA, the Court has considered whether the Legislature intended to displace the common-law rule of *Diehl* and *Restatement* § 396 when it enacted the NMUTSA. It is firmly established that "[a] statute will be interpreted as supplanting the common law only if there is an explicit indication that the legislature so intended." *Sims v. Sims*, 122 N.M. 618, 623 (1996). As the Washington Supreme Court has noted, "the Uniform Trade Secrets Act codifies the basic principles of common law trade secret protection. In the absence of legislative intent to the contrary, prior common law which is not contradicted by the Uniform Trade Secrets Act should continue to guide courts in the interpretation of the Act." *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 427, 444-45 (Wash. 1999) (en banc).

In view of *Diehl*, the Court has considerable doubt whether the recalled names of a former employer's clients can constitute trade secrets under the common law. *See Pincheira v. Allstate Ins. Co.*, 144 N.M. 601, 605 (2008) (citing *Diehl* as having held that "a list of customers on a laundry route is not a trade secret"). Even assuming for purposes of argument that the NMUTSA has broadened the definition of trade secret, a plaintiff must still show that the trade secrets in question have been "misappropriated."

---

[12] The Court understands the number of SFSA's customers at issue is somewhere around 62. A list of five dozen or so customers easily could be reconstructed by Defendants from memory, bringing the present case within the rule of *Diehl* and *Restatement* § 396.

Section 57-3A-2(B)(1) defines misappropriation as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means."  "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of duty to maintain secrecy or espionage through electronic of other means." Section 57-3A-2(A).  An employee's recollection of  the names of a former employer's clients does not fit comfortably within § 57-3A-2(A)'s definition of "improper means."  Mere recollection of the names of clients with whom the employee had personal contact as part of his job cannot reasonably be understood to constitute theft, bribery, misrepresentation  or espionage.  "When leaving one company for another, an employee is not required to have a partial lobotomy to remove all information relevant to his former position." *Winner Logistics, Inc. v. Labor & Logistics, Inc.*,  2011 WL 10524983 (Pa. Com. Pl. 2011) *1 (unpublished decision).  The remaining definition of  improper means set out in § 57-3A-2(A) is "breach or inducement of "breach of a duty to maintain secrecy."  In the absence of a confidentiality agreement or a covenant not to compete, whether an employee has  a duty to maintain secrecy by refraining from using the recalled identity of the former employer's clients to compete against the former employer depends on the common law.  If *Diehl* survives, a former employee has a common-law right to use the recalled identities of the former employer's clients to compete with the former employer, and in the absence of a confidentiality agreement or a covenant not to compete, the former employee's disclosure or use of  the recalled identities of the former employer's  clients cannot be said to be in breach of a duty to maintain secrecy.  This exercise in circular reasoning  persuades the Court that

18

the text of the NMUTSA does not provide the requisite "explicit indication" of the Legislature's intention to displace the common law as announced in *Diehl*. *See Ed Nowogroski Ins.*, 971 P.2d at 446 n.6 (recognizing that whether Uniform Trade Secret Act abrogates common-law "memory rule" with respect to former employee's solicitation of former employer's customers may depend on the common-law rule in effect at the time a jurisdiction adopted the UTSA). The Court concludes that the rule of *Diehl* remains good law and therefore Defendants' use of the recollected names of FSFA's clients does not constitute misappropriation of a trade secret.

To summarize, Plaintiffs have established a reasonable likelihood that Defendants engaged in actual misappropriation as defined by § 57-3A-2(B)(1) by improperly acquiring confidential documents containing trade secrets of FSFA. Plaintiffs have not established a reasonable likelihood that Defendants have threatened or engaged in misappropriation as defined by § 57-3A-2(B)(2) through the use of FSFA's trade secrets.

As to the second preliminary injunction factor, our Court of Appeals has held that "[W]hen the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown." *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)) (internal quotation marks omitted); *but see RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) ("We note that the Supreme Court [in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388

(2006)] has rejected the application of categorical rules in injunction cases.").   In view of the New Mexico Legislature's provision of an injunctive remedy, § 57-3A-3, the NMUTSA would appear to fall within the rule of *Star Fuel*.  The Court therefore finds that given Plaintiffs' showing of a likelihood that Defendant Marion improperly acquired FSFA's trade secrets, Plaintiffs need not demonstrate irreparable harm to obtain a preliminary injunction against Defendants continued possession or use of FSFA's trade secrets.

Turning to the third factor, the Court has found that FSFA will be presumed to suffer irreparable harm from the denial of an injunction against Defendants' continued possession or use  of trade secrets contained in the improperly acquired documents. Defendants will not suffer harm from an injunction against Defendants' continued possession or use of trade secrets contained in the improperly acquired documents because (1) Defendants have already agreed to return the documents improperly acquired by Defendant Marion and (2) Defendants have not used and do not intend to use information obtained from the documents improperly acquired by Defendant Marion.

As to the final factor, the Court finds that a preliminary injunction against Defendants' continued possession or use of trade secrets is not adverse to the public interest.

**Conclusion**

The Court finds that the balance of factors favors the grant of a preliminary injunction requiring Defendants to permanently delete from their computers the documents that Defendant Marion e-mailed to his personal e-mail account on January 28,

2014; to destroy any electronic or hard copies of those documents in their possession; and to refrain from using in the course of SFA's business any information obtained from those documents.  The Court finds that the balance of factors does not otherwise favor provisional injunctive relief.

**WHEREFORE, IT IS HEREBY IS ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction Hearing [Doc. 2] is **granted in part** and **denied in part**;

**IT IS FURTHER ORDERED** that no later than 5:00 p.m., July 11, 2014 Defendants are to (1) permanently delete from their computers the documents downloaded from FSFA's server by Defendant Marion and e-mailed to his personal e-mail account on January 28, 2014; and (2) destroy any electronic or hard copies of those documents in their possession; and (3) certify their compliance with this Order.

**IT IS FURTHER ORDERED** that Defendants are to refrain from using in the course of SFA's business any information obtained from the documents downloaded from FSFA's server by Defendant Marion and e-mailed to his personal e-mail account on January 28, 2014.

So ordered this 7th day of July, 2014.


_____
M. CHRISTINA ARMIJO
Chief United States District Judge


21